Good morning, everyone. We're here for a consolidated oral argument in three cases, 19-3010, 3034-3035, U.S. v. Stein, Allen, and Wright. Each side will have 40 minutes. That includes rebuttal time for the appellants. And I gather that you have not decided exactly how much time each of the appellant's attorneys will take. That will, I guess, depend on the questioning. But this usually doesn't work real well. I hope we can do okay today. But why don't you begin? I believe, Ms. Nichols, you're starting. Is that correct? Yes, Your Honor. Thank you. Good morning. I'm Paige Nichols here on behalf of Appellant Curtis Allen. And with the Court's permission, I would like to discuss the jury acts this morning and then hand things off to Mr. Stein's counsel to discuss entrapment. And then Mr. Wright's counsel will finish us up with his case-specific issues and work to save that rebuttal time. May it please the Court. The District Court found here that in practice, citizens from the Dodge City, Fort Scott, and Salina jury divisions do not have an opportunity to serve on petty juries in the District of Kansas. And nobody disputes that finding. The District Court then held that it would not make any change to that practice in Mr. Allen's case because, according to the District Court, Mr. Allen did not have prudential standing to bring, to argue the rights under the All-Citizens Provision of the Act. Now the government no longer contests our standing, so today's issues appear to be three, timeliness, whether the District Court substantially failed to comply with the Act in this case, and what the remedy for that violation is today. I'm happy to go in any order, but I'll start with timeliness until the Court leads me some other direction. Now the District Court did not find our Jury Act motion untimely for two good reasons. One, the government never asked the District Court to find it untimely, despite having many opportunities to do that. And two, it was timely. Why was it timely? It was timely because it was filed within seven days of the judge's January order that first made the factual finding on which the motion was based, the finding that these jury divisions do not have an opportunity. And number two, in that January order, that's when the District Court said, I am not going to change that practice in this case. That triggered the seven-day clock. Mr. Allen filed his motion within that clock, and so it was a timely motion. I have a hard time seeing that. On November 16, 2017, you were informed exactly how they were going to do it. They were going to draw from the Wichita Hutchinson Division. That was made by, I believe, the courtroom deputy or court clerk, one or the other, and that decision was made. And it was the understanding and the practice, and that was congruent with the local rule. So it wasn't an aberration. I mean, that's congruent with the to look at. So how can it be that you have to wait for some sort of explicit determination that there would be no change to be on notice to contest? No, this is not a question of finality. This is a question of notice to contest. So the notice was not as definite as the court's finding later on. The notice was we tend not to draw from Dodge City. And the rule itself doesn't give us notice because it doesn't explicitly say we don't draw from these divisions for trials in these locations. So this case is quite different. Also, I think the best way for me to explain the timeliness is really to contrast the situation here with the situation in Wendricks and Green, where this court found that there were not timely motions made. And one reason here is that the problem in Wendricks and Green was up at the master jury will, step one of the process. So that was already done. It was a completed act, and it was explicitly called for under those rules. So you had two things that are different here. We're down here at step three. It's not a done deal until the judge said it was a done deal. In fact, at the hearing on that summons motion, the judge is still at that undecided about what he's going to do. And he says, I'm getting ready to send some summonses out. I'm going to start with Wichita, and then I will expand to Dodge City depending on my ruling on the summons motion. And so we have a very different circumstance here than the court was faced with in the Wendricks and Green cases. And I would like to point out- I'm looking at it right now. The local rule talks about drawing from the particular decision. And I don't understand why it would not have been readily apparent by just looking at that language and that there was something to contest. And I'll ask that question, but then the follow-up question is this. Where in the case law do you require the level of definiteness that you seem to be implying? I mean, the whole question is, is there enough for me to challenge what appears to be colorably appears to be the line of which- that they're following? So even if they're not going to follow it in every case, you know what the trend line is. You know what they've done as a traditional matter, and you would have known that at least based upon what took place on November 16th. Okay. So I think I might have an answer that combines the two questions. Right. And okay, I'll start with, does the rule give us notice? The rule did not give us notice because it doesn't specify that these other divisions will not be called for jury trials in these locations. And everybody seemed to agree on that below. The district court judge, the government, the parties, when they had the discussion at the hearing on the summons motion, everybody seemed to agree that the rule doesn't specify. So the rule itself doesn't give notice. And as to whether there is case law, I don't know that I have found a case from this court or another court where the problem being challenged is at step three as opposed to step one or step two. Step three is always going to come up closer to trial because that's about summoning the jurors for this particular trial. So I don't have a case, but I can talk about the specific language in the jury act itself. Ms. Nichols? Yes. How does this prevent random selection of jurors? The act requires a system of selection that affords no impermissible discrimination. And I just don't understand how you're arguing, you must be arguing that random selection of jurors is not permitted or is not able to happen when you just have two large groups. Nobody's being discriminated against. And I don't see your argument on that. Aside from timeliness. Okay. So what's happening as a matter of fact under the district court's finding is that half of the divisions in Kansas don't have the opportunity to serve or to be considered for service. And the reason for that is- Well, we don't care about that. We care that the defendant gets a fair trial and a random selection of potential juries. And I don't believe there's any cognizable part of the community that's excluded because of a geographic restriction because there was no courthouse there. Okay. So I believe what your honor is referring to is the standards for establishing a violation of the fair cross section requirement in the act, but that's not the only requirement in the act. The act also requires that all citizens shall have an opportunity to be considered for service. And then when we look at how the act plays out, random selection depends on all juror divisions being included at some point, having an opportunity to be summoned to trial. Here we don't have the kind of situation where sometimes you end up without having anyone- Where is the impermissible discrimination? The district court intentionally decided we don't call jurors from these three divisions ever to jury trials. Where is the impermissible discrimination of individual or groups? Not jurors. Jurors. Right. For the claim that we are bringing here, there is no law that says to us that we are required to identify the same type of groups that you have to identify to show an equal protection claim or a fair cross section claim. The reason that we don't have randomly generated results here is because we have total exclusion, not underrepresentation. And I think what your honor is saying, okay, yeah, I know you have that, but we don't care that these groups are excluded. There's nothing in the law that says they have to be included. Well, geographic location is not a suspect class. Right. For the purpose of fair cross section claims, this isn't a fair cross section claim. It's a claim that the practice in Kansas did not comply with the jury act as a whole, which includes the fair cross section requirement, but also includes the requirement that all citizens shall have an opportunity to be considered. They don't all have an equal opportunity to be considered, do they? You have different divisions. If Wichita has very few trials and Kansas City has a lot of trials, people in the Wichita area will have a much smaller chance of participating. That's okay under the statute, is it not? Yes, that's perfectly fine because that's random. Well, it's not exactly random because it depends on how many people live in which area, how much crime is committed. But as I understand the way the act works, it uses divisions that are decided by statute. The divisions are defined in 1869, this is 28 U.S.C. 1869E. And under that definition, the division depends on where court is held. And where court can be held is also determined by statute. There's a specific statute. What is it? I don't have it here. It's like section 99 or something. And it tells where court can be held in Kansas. And it lists eight places. And several of those are almost never, maybe never these days are having trials. And all the statute requires is that for each division, and that's the county surrounding a place where court is held, for each division, every county must be proportionally represented in the jury pool. And so it seems to me there might be a policy statement in the first section of the act. But then when you go to the specifics of the act, it tells you exactly how you're supposed to have this equal apportionment. And the equal apportionment is within each division. And the division is defined by statute as places where court can be held. And that, and those places where court can be held are set forth in the act. So the fact that, well, in New Mexico, for example, we can have court in Santa Fe, Roswell, Las Cruces, uh, actually also Silver City where I don't think we've ever had a federal trial in my lifetime. And the fact that people who live in Silver City or in Roswell rarely get to serve on trial juries. It's just a matter of, they're not being very many trials in Roswell. And the act recognizes that people shouldn't have to travel too far to serve on a jury. I spoke in quite a while there, but I don't see how there's a violation of the act when I read the specifics of the act. Um, so yes, there's a lot going on here, um, throughout the act. And as to whether this is merely a policy statement in 1861, well, this court has never treated the fair cross section part as merely a policy statement. And the, and this Congress used the same strong shall there, but more importantly, throughout the act, there are continual references back to 1861. There are things that the district court can do in its plan so long as it's consistent with 1861, right? So, um, what about this problem of, yes, of course, there are going to be divisions that don't have, um, the same likelihood of citizens having a chance to go sit on a jury trial. And that is probably fine. But what we have here is a district court decision to exclude jurors, knowing that we, I mean, we have a finding here. We have a pretty strong, broad finding that these jurors do not have an opportunity. And that is a district court decision. And the act allows district courts to adopt the kinds of things that people can be excused for if they raise their hand on an individual request and ask for an excusal such as that traveling hardship. But here it's by court order. The citizens don't have that opportunity. It's not by their choice. You keep saying that, but I'm not sure why they don't have an opportunity writ large. I mean, to use Judge Hart's hypothetical, the juror in Silver City has an opportunity. It just happens that they are holding trials in places that would not draw from that individual. I mean, from Silver City. If there's nothing to categorically bar them from holding a trial in Silver City, and if they did, that person would have their opportunity. I mean, if the statute does, you know, I accept the premise that the policy statement is operational. It seems to me it is anyway. But it is cabined by the rest of the statute. And the rest of the statute defines what opportunity means. And opportunity means that if you're in the division where there's a surrounding a courthouse and there's a trial, you're going to be drawn proportionally. If you're not, you're not. It doesn't categorically bar you from having an opportunity. I mean, Judge Melgrin could have well said, or I don't know whether it was Melgrin or not, but I mean, the judge could have well said, I'm going to go hold trial in Dodge City. So fine. That would have been great. And it would have... Yes, it would have eliminated an issue. But the point is, why is it required that that be the case? The substantial failure to comply with the act comes from the fact that the court's practice, which is an intentional practice, well meaning or not, has created over decades this situation where we don't have courthouses in those divisions. And so we are a full step away from cases where there are courthouses in the division, but they aren't very active. And there are plenty of jury plans out there. Utah comes to mind. I don't, I'm not sure about Colorado, where the plans allow for people to be pulled into other courthouses in other divisions so that they will have an opportunity to serve, just like the district court did in its standing order that it adopted two years after Mr. Allen's case. And that would be entirely fine. Of course, but we're not talking about what is the best practice. We're talking about what's required by the statute and what in the statute requires that. I mean, what language do you point to beyond this sort of, well, somewhat vague language that needs to be defined in the policy statement as to what you're supposed to do? It comes from, I think I'm going to start repeating myself here. So I don't know. But there's a definite violation of the statute when the district court makes a decision to exclude divisions from an opportunity for service. And that is what the record reflects happened here. If I may, I'd like to hand things off to Mr. Stein's counsel to talk about entrapment. Good. Yes. Thank you. Ms. Esser? Good morning. My name is Meredith Esser and I represent Patrick Stein in this case. The district court should have instructed the jury as to the defense of entrapment. Under this court's law, an entrapment instruction must be given if the defense can point to any evidence that would create a triable issue from which a reasonable juror could derive reasonable doubt in the light most favorable to the accused. This court's review is de novo, but I would like to draw the court's attention to the fact that the district judge actually used the wrong standard below in assessing whether or not to give the instruction. The district court incorrectly agreed with the government that the threshold requirement for an entrapment defense is, quote, relatively high. That's not the standard. The standard is not a relatively high bar. Actually, it's the opposite. The defendant only needs enough evidence to create a triable issue. And use of this wrong standard below led to the wrong result. The district court also got caught up in factual disputes and credited the government's version of the facts. This was also error because under this court's law, all the defendant needs to show is any evidence that would create a triable issue in the light most favorable to him. The co-defendants in this case, and Mr. Stein in particular, can easily point to evidence of both inducement and lack of predisposition. This court is clear that evidence of persuasion, fraudulent misrepresentation, coercive tactics, promises of reward, or pleas based on friendship are the kinds of government inducement that may form the basis of an entrapment defense. And in this case, Mr. Day used all of these tactics with the co-defendants and with Mr. Stein in particular. On June 14, 2016, in the morning, Mr. Stein calls Mr. Day and tells Mr. Day that they essentially that we need to act in light of the Pulse nightclub shooting. I don't see in that any inducement at all. And so if you're going to give me some inducement, give me some inducement before that phone call. Because when that phone call gets made, there's nobody telling him to pick up the phone and call him in the minute. Sure. I think that we need to start earlier in the timeline, which is when Mr. Day and Mr. Stein go on this drive. I call it a ride along in Garden City. And Mr. Day is actually pointing out the ultimate location, the Mary Street apartment complex, which Mr. Stein didn't know where it was before he encountered Mr. Day. And Mr. Day had actually been involved in FBI surveillance of a separate militia group for months and months before he even met Mr. Stein and was sort of, he's from Garden City. He was sort of the expert in that location and in that region. And the relevance of that is what? Because in that ride along, that's the same ride along where Mr. Stein is identifying two purportedly Muslim women who, well, by the testimony in Mr. Day that he would want to do something to, violent. And so, I mean, what is it about Mr. Day's prior activity as an informant that has any relevance to this determination? I think it's just the fact that Mr. Day had already been sort of infiltrated in this whole community. And I think it's important to note that all of the testimony that Mr. Day presented about this ride along was just that. It was Day's testimony that the jury could have rejected. And there were plenty of reasons why the jury could have rejected all of Mr. Day's testimony or credited some of it and rejected other testimony. But certain facts are undisputed. And one of the facts is that Mr. Day showed Mr. Stein the target location that he gave other facts or that he gave the maps to Stein. He made up this homework assignment where he directed the co-defendants again to the Mary Street location. And even the government's brief talks about Day decided that he would suggest the apartment complex and mosque at 312 Mary Street, both because the defendants already knew about it from Crick's outing and because the FBI would be well positioned to intercept any threat because of the location's proximity to the field office. So that's a direct quote from the government's brief. Even the government agreed that Mr. Stein, or sorry, that Day was continually directing the co-defendants to this particular target. Okay. I'm in a fight to kill the President of the United States. I deal with an informant in order to allow me to be captured, says, well, why don't you go get him at X point? I tell the informant, that's what I'm going to do. That's what I want to do. I want to take care of this problem. Well, the informant is trying to control the situation. So he sends me to somewhere where law enforcement is. Why is that problematic? All you've got is, I mean, under one theory and the theory of the evidence that appears to be here, you've got Mr. Day steering someone who had the intent to do something anyway. All you're doing is creating an opportunity for him to be caught. And I think the other view is that Mr. Day was steering the co-defendants into this particular plot and doing so using inflammatory language, lying, telling the co-defendants that the people living in that apartment complex were involved in human trafficking, gun running, selling drugs in order to fund ISIS. I mean, that was a latent lie that he told the co-defendants in order to inflame their already extremist views, admittedly extremist views, but views that had never materialized into anything criminal prior to that. And I think that the point that I'd like to come back to is, this court doesn't need to resolve the issue of whether the co-defendants were entrapped. The court only needs to decide whether or not there was a triable issue. Issues, facts from which a reasonable jury could derive reasonable doubt. I agree. And let me tell me, Ben, tell me please, what are your two or three most salient facts that should have led this to be perceived as being a triable issue? Sorting through it all, give me what is your best shot as to why this would have been a triable issue. Yes, I agree there is a lot to work with here. And so I think, like I said, the fact that Mr. Stein didn't know about this location before meeting Mr. Day, the fact of Mr. Day lying to the co-defendants early on in the plot about that these folks at Mary Street were human trafficking and funding ISIS. And I think the fact, in terms of lack of predisposition, the fact that nothing like this had ever materialized before, even though Mr. Stein had been exhibiting inflammatory language and sort of grandiose scheming, all of this was just, was rhetoric as admitted by Brody Benson at that Pulse nightclub shooting, he said, or at the meeting about the Pulse nightclub shooting, he said, all of this was just blowing smoke. It was just, you know, blowing off steam because 49 Americans had been killed. And I think those are, in terms of lack of, in terms of inducement, it's the fact that he was radicalizing them over a long period of time and directing them to this location. And then in terms of lack of predisposition, there was, you know, they had been stuck for quite a long time and nothing like this had ever happened prior to that, you know, prior to Day's involvement. I think that, I'm sorry. By Mr. Stein's own admission, it was the Pulse nightclub shooting that caused him to become operational. I mean, what, why, I mean, that that's, so there's no, the fact that it, going on the question of predisposition, the fact that he decided then to act, he's the one who said, yes, that is the turning point. I have to ask, so the fact that nothing has happened before this, what does that tell you? Well, at that point, and I will say that predisposition has to be prior to the time of contact. And at that point, Mr. Day and Mr. Stein had already been talking every day for a long time. A lot of this rhetoric had been sort of augmented by Mr. Day's involvement. And in addition, I mean, we've got conflicting testimony about the Pulse nightclub shooting, which again is this Brody Benson quote saying, this was just blowing smoke. I mean, everybody was really emotional about this. And this, you know, nobody really thought that this was going to materialize. This was just blowing smoke. This was just venting. And so I think that, yes, there is conflicting testimony, but that's the point. The testimony and the evidence has to be viewed in the light most favorable to the defendants in this case. And I think that there is enough to have for the district court to have given the entrapment instruction. And at this point, I think I need to turn things over to my co-counsel. Thank you. I'm sorry. No, I apologize. You're in the wrong order on the screen. Thank you. Not a problem. I will start out just a few moments on entrapment as to Mr. Wright, Your Honor. And then I will move to the issue that we've identified as the co-conspirator exception under 801 D2E. And then finally, a few moments on materiality. And I will be I think the important thing as to Mr. Wright on entrapment is that he did not come in until later into the plot that the co-defendants were convicted of developing. And I think it's important to recognize, again, that it's not the district court's job or this court's job to as to entrapment. But the question is whether it should have been submitted to the jury based on the evidence in the record. And we believe that it should have been. And I believe co-counsel has outlined the law on that quite well. And with that, we join. The important thing, Your Honor, is that in this particular case on these facts, Dan Day, the informant, was not, as to Gavin Wright, attempting to infiltrate an organization or to take actions to do that as what was going on, for example, in the Vincent case. By the time, particularly as to Gavin Wright, he was already involved in this organization. He was already actively involved in the design of the plot. But in fact, by the time he got to Mr. Wright, his job for the FBI was no longer to try and identify criminal conduct, but to actually recruit Mr. Wright into that conduct and to continue to build the plot. And if you look at the evidence that was in the record, Your Honor, it's clear as to inducement. Mr. Wright just went to a meeting. Mr. Day spoke at that meeting. He was already there trying to promote something dealing with anti-Muslim rhetoric. Which meeting are you talking about? And to be more specific, under your timeline, when is the first contact between Mr. Wright and law enforcement? I believe it was in July, July 18th, Your Honor, of 2016. He was very much later in this plot. And that was the meeting where Dan Day was one of the speakers. The Reavers were also there, and there were some of the other individuals involved. Dan Day, by his own testimony, became a recruiter. That's how he described himself in his persona as an FBI informant. And it's also important to remember that the crime here, and I think this was very well set forth by co-counsel, was not the crime of being charged for aiding or abetting or follow through. It was the crime of conspiracy. So the object of Dan Day's involvement was just to get somebody to agree. And that is a very, very low bar when we compare it to other types of crimes where we have entrapment. Dan Day was the recruiter. His job, by his own testimony, was to get others to agree. Dan Day identified himself as the vetting officer. He vetted Gavin Wright, again, trying to persuade him which was the element of this crime, to persuade him to join in this activity. So there was evidence in the record that should have, and this is not the way the similar to a burden shifting, that once there is any evidence presented by the defendant, then the burden shifts to the United States in a criminal case to prove that beyond a reasonable doubt, that in this case, they did not induce Gavin Wright to agree to engage in a conspiracy to use a weapon of mass destruction, and it is incumbent on the court to view the evidence in the light most favorable to the defendant. It seems to me that this whole, the idea that the charge is conspiracy doesn't necessarily work to your favor because what we've been talking about is the timeline in part between Mr. Day's contact with Mr. Wright. If the evidence were to show that Mr. Wright had already been in a conspiracy with these two defendants prior to the time of his contact with Mr. Day, then it really, because the charge is conspiracy, the fact that he had not had individual contact with Mr. Day wouldn't change anything. I mean, the whole question would be, did he induce the premise of the charge, and the charge is an all I'm saying is it doesn't necessarily cut in your favor that the charge is a conspiracy because it is an agreement. It is not necessarily contingent upon contact between Mr. Day and Mr. Wright, is it? I don't disagree with your honor that that is, that those things are true, but the point I think that we're all making is that the jury should have made that determination, that that burden shifting did in fact occur. And then when you look at the second piece of entrapment as to Mr. Wright, there was sizable evidence as to the fact that he was not predisposed to engage in this. And those two things can't be taken in a vacuum. Your honor, I'd like to go ahead and move on to the James issue. I will try to be timely here so that I reserve rebuttal time. I think the most important thing is to, to look at the co-conspirator exception in this case, as it's grounded in the due process rights of the criminally accused, and the right to confrontation, and the right to a fair trial. And I know that this court is well versed in the requirements of James. And we cited and in fact, gave to the district judge, the copy of the daily on district court opinion that came out right before the trial started in this case from the New Mexico district case, or excuse me, which in my opinion is a very good treatise on how and why we have James hearings and what those processes should be. And the key is that it should be a preliminary determination of admissibility of evidence based on something more than a bald proffer by the United States. And it requires the United States to put on some corroborating evidence of proffered statement. It did not happen in this case. Now, it would be easy and cavalier to say, well, so what? It's a big deal, because Gavin Wright was denied of the right to have the United States identified discrete Williamson statements and assertions. He was denied the right to require identification in a timely manner by the United States of what those statements would be, not after the beginning of trial. He was denied the right... Let me interrupt you. To get reversal, don't you have to point to one statement at least that was improperly admitted? And have you done that? Your Honor, it's a difficult thing to do in this case because of the process problem. There were 1,800 pages of asserted statements that were... That gives you plenty of opportunity to pick one that was inadmissible, doesn't it? Your Honor, I think the problem was identified as it came out in trial. We ended up having to rely on the assertions by the government that those statements were true and accurate, which turned out to not be true. We don't know, because of the volume and the process that was followed here and the denial of the court to even test the evidence, what statements ultimately were not true. We know of the one instance that we've identified in the case and in the transcript that happened during trial, but it was already after trial. At some point, the denial of the process itself is problematic. You were given draft transcripts and government states on May 11th, 2017. The government docket exhibited on March 8th, 2018. There was plenty of time to identify problems. The guts, at least as I understand of your position, is one of fundamental unfairness. You talk about due process. Where is the unfairness, given the length of time you had to both identify problems, create your own transcript based upon the audio recordings if you needed to do that? You had plenty of time to do these things. Where is the fundamental unfairness here? Your Honor, I'm going to answer that, and then I'm going to have to move on in order to reserve rebuttal time, and I apologize for that. If those transcripts were revised and revised and edited, and all the attorneys worked on them for hours and hours and hours, the problem was that there were errors along the way. To the extent that we could, we identified all of that. Then fast forward to the James hearing, and at that point, it becomes an issue of admissibility and preliminary admissibility. The process was at some point, then there's no meaningful preliminary determination where witnesses testify and the defendants can challenge the underlying corroboration and admissibility of those statements. Your Honor, I apologize, but I need to retain the rest of my time for rebuttal. Thank you. Thank you. Ms. Flynn, you'll be next, but if you'll give me 20 seconds, I need to get something that I don't have. I'll be right back. I apologize. Ms. Flynn, you may proceed. I please support Aaron Flynn on behalf of the As your honors know, defendants were convicted of conspiring to use a weapon of mass destruction and to violate civil rights based on their plan to bomb an apartment complex and mosque used primarily by Muslim refugees. In defendants' view, the complex represented not only a growing Muslim threat, but everything wrong with the government's immigration and refugee policies. Because defendants have identified no reversible error, this court should affirm their convictions and sentences, as well as defendants' rights, additional false statements conviction. And I'll turn first to the Jury Act claim, which this court can dispose of as time barred, but which also fails on the merits. And in exchange for judicial relief without a showing of prejudice to the defendants, Congress squarely placed the burden on the defendants to do two things when challenging federal jury selection. And the first is to comply with Section 1867's requirements. And the second is to establish a substantial violation of the act. And here, defendants did neither. First, as to the procedural requirements, the defendants' failure to timely raise their all citizens claim, so to speak, is fatal to the claim. As Judge Holmes, as you pointed out, the defendants were on notice by at least November 16th that the division and yet... Let me ask you about that, please. As I understood Ms. Nichols' argument on that, the plan ordinarily provided for just selection from within the division, but the judge hadn't decided whether or not there would be additional jurors brought in from other divisions. So that was still pending. And therefore, the objection at that time would be premature. Tell me your response to that. No. So I think that's an incorrect characterization of the record in terms of how this came up and how the judge was thinking about the issue. So at the November 16th conference, Your Honor, the defendants had raised an issue about potentially prejudicial media coverage in pull that far west to Pratt County. And because the jury coordinator was there to discuss the timing of jury questionnaires, given the need to potentially have a fairly large jury pool in this case, the jury coordinator confirmed at the November 16th conference at that time that it was the district court's practice to pull only from Wichita-Hudson Division for Wichita-based trials. And so when the district court said, well, we tend not to pull that far west, what's clear and then looking at the local rules is that the court was talking about the delineation of that western boundary of the Wichita-Hudson Division, which stops at Pratt County. And so the district court at that time made no indication that it was taking under consideration whether to pull in the Dodge City Division jurors at all. And that question didn't arise until the defendant's December 8th motion, which sought to include the Dodge City Division jurors on their cross-section grounds under both the Sixth Amendment and the Jury Act, and the separate sort of equal protection claim to bring in those division jurors. And so at the very latest, as of the December 8th motion, and we would argue it was still at that point in time because it wasn't within seven days of the November 16th conference, but as of that first motion, what the defendants were doing was saying to the judge that they were legally required, he was legally required to sweep in the Dodge City Division jurors into their trial. And so at that point in time, they should have included this all citizens claim in that first when he was considering whether there was any legal basis to increase the scope of the jury pool. And certainly there was no basis for any second motion once the district court had already decided that there was no reason to pull in those jurors as a legal matter. Thank you. And, Your Honor, the court has been clear in all of its cases, in Windricks, in Green, in Kennedy, that the strict compliance with the seven-day requirement is fatal to the defendant's jury act claim, that claims can be time-barred even if there's a substantial violation under the act. And so here, as we said, it is time-barred. And just to be clear, the government did invoke the seven-day rule at the time of the second motion, and that's at 6R1274, where we invoked the legal standard, and then at, oh, sorry, that's 1R1274, and then specifically relied on the seven-day period from the November 16th status conference at 1R1277. Did you claim that the December motion was time-barred? Because it would have been time-barred too, right? Oh, yeah, that was time-barred also, but the fact that the defendants are now saying that this was a claim that was basically encompassed only in their second motion, our argument is that it should have been in your first motion, and even your first motion was both procedurally barred because it didn't include a statement, a sworn statement of fact, and it was time-barred because it was too late. And, Your Honors, there's simply no violation and certainly not a substantial violation of the act. Judge Kelly, as you recognize, the fundamental purpose of the Jury Act is to prevent impermissible discrimination in the selection of federal jurors. The Act accomplishes that through the operative provisions, which are sections 1862 through 1869. Why is 1861 an operative provision? You read the case test, you know, among others, and it seems that we have found 1861 to have operative effect. Sure, it may be caverned and constrained by the other provisions, but it's not a nullity or a statement of policy, is it? Why? It's not a nullity, Your Honor. I think that this court has consistently sort of treated the fair cross-section claims a little bit differently than we view this claim. The first policy statement talked about a right to a fair cross-section pulled from a random selection through random selection means, and the Jury Act itself recognized that that right in the Jury Act is synonymous with a Sixth Amendment right, and so I think that's why in the case law you see claims brought under 1861 tied to Sixth Amendment constitutional claims, because the court has consistently used the same standards in deciding those claims. But the Supreme Court in Taylor, for example, talked about 1861 being the policy statement for the Act, and then 1862 through 1866 being the machinery through which the Act is implemented, and so when we talk about the operative or substantive provisions, we're simply saying what Your Honor's recognized earlier was that you have to look at the provisions of the Act and determine is there something that has gone awry there that would give rise to a violation, and then once you've established a violation, you still need to undertake the evaluation of is it substantial by determining did it affect random selection. But in determining whether there's a violation, aren't you going to look to see whether the operation of the machinery is congruent with 1861 and the purposes sought to be achieved by that? Yes, you would, Your Honor, and we would say that it is because the first sentence, as I said, talks about the random selection in order to assure a fair cross-section, and then the second policy statement, when it talks about all citizens having the opportunity to be considered for service, that's simply implemented through the objective criteria, and this is clear from the court's case law from contemporaneous decisions with the passage of the Jury Act, whether it's Bearden or Taylor or Rabinowitz, that all of these cases recognize that what the second policy statement is doing was making sure that jury coordinators and district courts were going to treat the act as both a ceiling and a floor in terms of proper federal juror selection, and so they couldn't add subjective notions of what it meant to be a competent juror on top of those provisions that Congress had decided would ensure sort of fair opportunity and equal opportunity for people in the same division to be selected for federal jury service. And so opportunity would be, in some sense, the meaning of that term would be constrained by the, I think you used the word machinery, of the provisions that followed. In other words, opportunity is not left in some vague undefined sense, really, but it's constrained by the other provisions. Right, exactly, Your Honor, and the opportunity language we submit really goes to the objective selection criteria and those provisions in 1863 through 1866, and so what the act is ensuring is that within each division that there's a fair opportunity and an equal opportunity for the jurors in that division to both populate the division qualified jury wheel and to be pulled from that wheel. And so in the Wichita Hutchinson division, for example, the jurors are selected, randomly selected, from the registered voter list. They're pulled into the jury wheel. They go through the same process of qualification forms, determining disqualifications, exemptions, excusals, and exclusions, and there cannot be any sort of subjective criteria that's layered on top of that process within the division. At least in a common sense sort of way, or at least in a layman sense, if I'm sitting in Dodge City and I want to serve on a juror, why wouldn't I perceive myself to have been denied an opportunity by this statute to do so? Well, the denial sort of that that juror may somehow feel your honor isn't cognizable in a sense under the under the jury act, and so it's clear from the division definition, which the defendants have said they can see they're not challenging in any way, and from this court's decision and test that you don't have to cross division lines to sweep in jurors from elsewhere in the division, elsewhere in the district, and that's consistent with the Sixth Amendment right to have only a jury from the district and the state in which your crime occurred. You do not have to have a jury from the division in which your crime occurred. It's consistent with Rule 18. If a defendant has sought or another litigant, for example, had sought under Rule 18 to move their trial elsewhere, then it may be in circumstance that the court is holding trial elsewhere and pulling from one of those outer divisions, so to speak, but once that occurs, the selection within that division is still happening pursuant to the act and under the random selection and objective criteria, and so for all of those reasons, we don't see any violation in the act because the court's precedent and the act itself sort of recognizes that there may be these geographic imbalances in test. One of the challenges was that the defendants in that case said, look, you know, jurors in the Grand Junction and Pueblo divisions are effectively being excluded from jury service because the vast majority of trials are held in Denver, and this court said absent some sort of intentional gerrymandering of lines or the exclusion of a distinct and cognizable group under Sixth Amendment fair cross-section jurisprudence, there's just simply no basis to bring in those jurors, and it's not a concern for purposes of the act, and again, even if that were a violation, the defendants would have to show a substantial violation, and there's simply no basis for the court to conclude that random selection is impeded here, that there's any effect on fair cross-section, which the defendants have conceded there isn't, and that there's anything happening but an application of objective criteria within the division that the court is actually pulling from. Unless there are other questions on the jury act claim, I'll move to entrapment. As to entrapment, the defendants failed to offer sufficient evidence of inducement or predisposition, and therefore the district court correctly decided that they weren't entrapped as a matter of law and declined to give the instruction, and there was a reason that the district court concluded that the evidence didn't at all warrant the instruction in this case, and that was because defendants not day hatched this plan and never expressed any doubt about carrying it out. It was because defendants used racial slurs, spewed anti-Muslim rhetoric, and repeatedly raised killing Muslims throughout the entire course of the conspiracy. The defendants tried to recruit others, and then when the other KSAS members stepped back and sort of expressed doubt and said, whoa, this isn't what the militia is about, what are you guys doing? The defendants simply thought to shut them up and cut them out and move on with their plan. The same way it was the defendants who debated when to strike and where to strike and how best to maim and kill innocent victims, they assembled the knowledge and materials for explosives. They read those materials, watched the videos, printed out the recipes, gathered the ingredients and tools, and manufactured and tested the explosives. They were the ones who drafted the manifesto and decided that if this attack weren't enough to get their message across that they were going to have future attacks. And throughout the conspiracy, as I said, there was no concern about committing these crimes. To the end, the defendants' only concern was about not getting caught. And here where the evidence simply shows that it was the defendants who were hosting these meetings, convening these meetings, giving day instructions as to what it is they wanted, what intelligence they needed, and what it is that he needed to do for them, that there was simply no basis on the largely undisputed record that there was no reason to give the instruction at all. Your Honor, the defendants in their briefing and the reply briefs in particular talk about sort of credibility issues to resolve, but really there was no conflicting evidence here at all. The Dan Day's testimony was consistent with the recordings, it was consistent with the testimony of Brody Benson, it was consistent with the testimony of Lula Harris, and it was consistent with the testimony of all of the items that were seized from defendants' homes and from G&G. And so the defendants' arguments without kind of any evidence and sufficient foundation in the record to support those arguments simply isn't enough to get the instruction here. Mr. Wright in his argument identified a few different things about, you know, whether it was Dan Day who was seeking to recruit him in particular. The July 18th meeting, which was sort of one of the first times that Mr. Wright appears in the recordings, it's clear this is the same meeting where the defendants were seeking to recruit the Spooners. Dan Day is the person in that recording who says to Janina Spooner, look, if you're really nervous about this and you don't want to be involved in this, you can step away. Other people have stepped away and you can do so too. So the fact that at that meeting, Dan Day is the only person telling people to step away and the defendants are, you know, moving ahead with this really shows that there's no basis on which to conclude or no evidence from which the jury could find a genuine triable issue that Dan Day is the person here who's seeking to recruit the defendant. The same way for that July 18th meeting, Dan Day had not been in contact independently with Mr. Wright at all. It's clear that at the end of the meeting, Mr. Wright is the individual who offered up his business as a private place for the defendants to meet because Defendant Stein and Defendant Allen were both concerned that they wouldn't be able to hatch this plan in public and they needed a secret location in which to talk further about their plans. And Mr. Wright was the one who said, well, I have a business. We have 24-7 access. The business in Liberal is the one that I run. My brother's not present. And so we can, you know, move forward with our plans there. It's the same meeting where Defendant Wright also offers to help Dan Day in terms of gathering information from Garden City because he knows Garden City having grown up there and said that he could easily get And so the notion that, you know, Dan Day is the one who's inducing defendants to commit this crime and sort of moving forward with plans is completely belied by the record and the reason that the district court declined to give the instruction in this case. If there are no other questions on entrapment, unless the court has questions about the terrorism enhancement, we're happy to rest on our briefs with respect to the terrorism enhancement. I think it's clear that- Well, let me ask you a question about the entrapment, which as it interacts with the notion of a conspiracy existing here, and this was a question that I, Ray, posed earlier. If in this situation and the evidence were to show that there had been communications prior to the interaction between Mr. Wright and Dan Day at that meeting, there had been communications between the two defendants, I mean, the two other defendants that would give rise to the notion that they themselves had formed a conspiracy, how would that cut in terms of the notion of there having to be individual contact between the government informant and each individual? I mean, the notion of inducement suggests that the government created this and how does that interact with the notion of a conspiracy where it could be that there was already an existing agreement? That's correct, your honor. So I think that what the involvement of the other KSS members shows in particular is that Dan Day had infiltrated this group. We're lucky that he infiltrated the group and came across Patrick Stein when he did, and that, you know, despite his being on these Zillow calls and various recordings that the entire group was having, these other KSS members did not react the same way to Dan Day. There's no evidence that the defendants put on that he somehow radicalized the group or was any more active in any of those calls than any of the defendants were or that any other member was, and so really it's looking at, you know, when did the agreement come into place? We know that from Brody Benson's testimony that it was that July 14th meeting where he says this isn't any more about blowing smoke, this isn't about what everyone else has been doing. There was a marked change with Patrick Stein and Curtis Allen at the end of that meeting, and this is where Dan Day isn't even present anymore. Was it June 14th? It was June 14th, your honor, and so that's the meeting where Dan Day passes out from heat stroke, and Brody Benson makes clear, and that the testimony isn't disputed on this. Brody Benson's testimony is that, you know, everyone's sort of talking about and upset about what happened at the Pulse nightclub shooting and that Curtis Allen arrived after Dan Day had already been taken away by ambulance, and Patrick Stein and Curtis Allen were talking about using high explosives against Muslims in Garden City or Liberal Kansas, and Dan Day isn't there for that conversation, and notably Dan Day also is the person with probably the least knowledge of explosives throughout the whole conspiracy, so this isn't an instance like where the FBI has an undercover who's in contact with the defendants and they seek to sort of have the defendants or steer the defendants towards using a hoax bomb because it gives them the best control over the situation. That happens much later in the conspiracy after it was already formed when it was clear that the were taking all of these steps to independently create explosives when we're getting closer and closer with both the ingredients that they were collecting, the materials that they were using, and the time that they were spending, unbeknownst to Dan Day, testing and working on creating materials that they were becoming much more of a threat in terms of moving towards actual fruition of the object of their conspiracy. And that goes towards what, I mean, we're dealing with two elements, inducement and predisposition. The predisposition, and correct me if I'm wrong in this, predisposition is determined by whether you had the predisposition prior to contact with law enforcement. Inducement deals with simply the question of control, right? Yes, and I think that for each defendant, it's a defendant-specific, count-specific inquiry as to whether they should get the instruction. Obviously, predisposition is an incredibly difficult element for Patrick Stein to meet here at the February meeting where Dan Day and Defendant Stein first meet, you know, the very first time that Patrick Stein is out with him. He's talking about using a fertilizer bomb to flatten the Garden City complex they visit, and they visit those not because Dan Day selects those sites, but because Jason Crick's militia had given Dan Day and Patrick Stein those locations, those places to visit. At the June 14 meeting, Mr. Day passes out, and so we get the rest of what went on from Mr. Benson. At what point did he leave? Because he was recording that meeting, right? Yes, so Dan Day was recording the meeting. He's there during the entire time that there's a conversation between Brody Benson, Shelby Lewis, and Patrick Stein. He passes out. He's taken away by ambulance. Shelby Lewis leaves at approximately the same time, and it's unclear exactly how long Patrick Stein and Brody Benson were waiting there together for Curtis Allen to arrive, but then it's the three individuals, Benson, Stein, and Allen who are there for the remainder of the meeting, and so we know what happened with the remainder of the meeting through Brody Benson's testimony. And we know of the interaction between Mr. Allen and Stein because of that communication. Yes, exactly, and then again, the defendant's next meet on June 9th. It's clear that Patrick Stein is the one who tells Dan Day to arrive to that meeting. That's the meeting with the birch and the reed verse, and Mr. Stein at that meeting is talking about the immediate threat and seeing Muslims in Kansas, and defendant Allen at that meeting talks about they first need to strike in Barden City, then Dodge City, and then Wichita, and so there's no independent contact between Dan Day and Curtis Allen until he sees him in person at that and Gavin Wright until Gavin Wright shows up at the next meeting, and so I do think that answers Your Honor's questions about, you know, who is deciding to show up where and when and why, and it was because defendants wanted to do this, not because Dan Day was inducing them to do so. I'm curious about something. I suspect it's not relevant, but I'm very curious. When Day passed out while secretly recording a meeting, how was his secret recording not discovered at that time? Your Honor, I actually, you know, I had the same curiosities, and I have not followed up with the trial team or the agent to determine that. I don't think it comes out in the record. I mean, he went to the hospital, so I can't give law enforcement secrets as to why it is someone wouldn't have come across that. Anyway, not in the record. Unless there are further questions, like I said, I can turn to the terrorism enhancement. I won't spend time on that unless the court has questions, but the district court did properly interpret and apply the enhancement, and any error would be harmless in any event. It's unequivocal that the district court would have imposed the same sentences here, it's clear that he would have done so under the alternate calculation where he would have applied upward departure, which defendants concede even in their briefs would have been warranted under the fact of this case. As to Mr. Wright's focus today on the James hearing, 801 D2E procedures, there was no abuse of discretion in how the district court handled the admissibility or the preliminary determination. As your honors pointed out, defendants write in his reply brief, and even today, makes clear that this is really an argument about process and not actual admissibility. The defendants have had these statements and recordings for four years now, and have still failed to show what was improper about the district court's 801 D2E determinations and why these weren't properly admitted co-conspirator statements. Well, following up on Judge Hart's point, to the extent that the essence of the argument is one of process, at the end of the day, aren't they required to show some prejudice as a result of the process? And doesn't that go to the point that there has to be at least one statement that they can point to that shouldn't have been admitted, that was the fruit of this allegedly defective process? I mean, if they don't have that, is that determinative? Yes, your honor, and it's clear in the case law that the reason that the defendants usually challenge the lack of preliminary foundational determinations is because at trial, the court ends up in a place where, having not had a James proceeding, the court can provisionally admit certain statements, and then the evidence doesn't later connect up, and then the court can't unring the bell, and there's been harm from the statements that have been allowed to come in despite not having made preliminary foundational determinations. And that's simply not the case here. There was an extensive James hearing. There were preliminary foundational determinations that were made before Dan Day testified. The government had already started to put on much of this evidence, so Brody Benson had testified already. His testimony was consistent with his sworn grand jury testimony, which was the independent evidence that the district court had relied on in making its determinations at the James hearing. Lula Harris had also testified about her observations and interactions with defendants, and law enforcement had testified about the various evidence that they had seized. And so at the time that Dan Day took the stand and the government, you know, thought to move to admit the actual recording, there was certainly a sufficient foundation supporting the district court's preliminary determinations to allow the district court to go ahead at that point and actually admit that evidence. And if there hadn't been... But going to Judge Hart's point, I mean, to your knowledge, is there any identified statement that they're claiming should have been admitted that should not have been admitted that was admitted? No. And following up, if I understand you correctly, as your understanding of the case law is that when one is talking about a defective process, it's an explanation for the improper admission of evidence? Yes, your honor. Okay. And so here we don't even have what would have been the proof of the improper process. Exactly. Okay. Yeah. And that's why the defendant wouldn't be able to make out harmless error. We submit under this court's case law the non-constitutional harmless error analysis, but even if there were a confrontation clause objection that had been made or due process or confrontation issues, it would be harmless beyond a reasonable doubt because there's been no statement identified that's prejudicial to defendant's rights. Unless the court had questions on materiality or the prosecutorial misconduct or cumulative error claims, we're happy to submit those responses on our brief and would simply ask the court in closing to affirm the defendant's convictions and sentences in all respects. Any questions from the panel? Okay. Who is responding in rebuttal? Have you three decided? I'll take a quick shot. Okay. I would like to make two points. One, test is different from this case. In test, there was a single will that all three divisions contributed to. The fact that some people were effectively excluded had to do with the fact that they would frequently seek hardship excusals and were granted those. So, they were excluded by citizen choice. So, that is really well understood if you read footnote four in test along with the background. Point number two, please read the government's response to our jury act motion carefully. They did not argue a time bar. They argued that it was an improper motion for rehearing. And now, I will yield to the other counselors if they would like a quick rebuttal time. Why is it determinative whether they argue for a time bar or not? I mean, we can affirm on any ground supported by the record. So, what difference does it make? I believe that they waived the time bar was the point of that. Ms. Esser, Ms. Schmidt, did either of you have? Your time is just about to start. No, your honor. Thank you. Okay. Well, thank you, everyone. And thank you for agreeing to rescheduling this at a time. There were certainly exigent circumstances that required our vacating the oral argument before, but it's good that we didn't delay this that much. So, cases submitted, counselor excused.